# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DAVEY JOE SUTTON, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Case No. CIV 08-134-JHP-KEW |
| ) | |
| DEPARTMENT OF CORRECTIONS, ) | |
| ) | |
| Respondent. ) | |

## REPORT AND RECOMMENDATION

This matter is before the Magistrate Judge on petitioner's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254, attacking his conviction in Latimer County District Court Case Number CF-03-131 for Witness Intimidation in violation of Okla. Stat. tit. 21, § 455, (Count 1). He raises the following grounds for relief:

 I. The element "mental harm," as used in Okla. Stat. tit. 21, § 455 is unconstitutionally vague.

 II. Evidence insufficient to support conviction.

 III. Trial court misinstructed jury on elements of offense.

 IV. Prosecutor told jury that Mr. Sutton was charged with this crime because the grand jury had proof beyond a reasonable doubt.

The respondent concedes that petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review and has submitted the following records to the court for consideration in this matter:

 A. Petitioner's direct appeal brief.

 B. The State's direct appeal brief.

C. Summary Opinion affirming petitioner's Judgment and Sentence. *Sutton v. State*, No. F-2004-1234 (Okla. Crim. App. Sept. 20, 2006).

D. Original Record in Latimer County District Court Case No. CF-03-131.

E. Transcripts of petitioner's jury trial and sentencing.

F. Trial exhibits.

G. Excerpt of transcript of Multi-county Grand Jury in Oklahoma County District Court Case No. CJ-03-5937.

**Standard of Review**

Under the Anti-Terrorism and Effective Death Penalty Act, federal habeas corpus relief is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> As to the "unreasonable application" standard, . . . only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254. . . . [A] decision is "objectively unreasonable" when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law. It is not enough that the decision is clearly wrong or that the reviewing court would have reached a contrary decision. . . . [T]he state court decision must be at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable.

*Sandoval v. Ulibarri*, 548 F.3d 902, 908 (10th Cir. 2008) (quoting *Maynard v. Boone*, 468 F.3d 665, 671 (10th Cir. 2006)), *cert. denied*, 549 U.S. 1285 (2007)).

2

**Ground I: Constitutionality of Okla. Stat. tit. 21, § 455**

Petitioner alleges the Witness Intimidation statute under which he was convicted is unconstitutionally vague, because the "mental harm" phrase is neither defined nor a term of common usage. The pertinent part of the statute at issue reads as follows:

> Every person who . . . threatens or procures physical or mental harm through force or fear with the intent to prevent any witness from appearing in court to give his testimony, or to alter his testimony is, upon conviction, guilty of a felony . . . .

Okla. Stat. tit. 21, § 455 (A).

Petitioner first raised this issue on direct appeal, but the Oklahoma Court of Criminal Appeals (OCCA) denied relief as follows:

> . . . [W]e presume a legislative act to be constitutional. *State v. Thomason*, 33 P.3d 930, 932 (Okla. Crim. App. 2001). The term "mental harm" as used in Okla. Stat. tit. 21, § 455 is not defined by the Legislature, but we do not find the phrase to be unconstitutionally vague, particularly as it is modified and explained by the statutory requirement that such harm be the product of "force or fear." *Gilbert v. State*, 765 P.2d 1208, 1210 (Okla. Crim. App. 1988). The statute in question does not unreasonably restrict the right to free speech, as it requires a specific intent to affect the administration of justice, in which the State has a compelling interest. *Allen v. City of Oklahoma City*, 965 P.2d 387, 389 (Okla. Crim. App. 1998). [The proposition] is denied.

*Sutton v. State*, No. F-2004-1234, slip op. at 2 (Okla. Crim. App. Sept. 20, 2006).

> The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

*Colten v. Kentucky*, 407 U.S. 104, 110 (1972).

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal

3

offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

The deferential standard of review under the Antiterrorism and Effective Death Penalty Act (AEDPA) controls review of a vagueness issue that was decided on the merits by the state court, even if the decision was in a summary fashion. *Sperry v. McKune*, 445 F.3d 1268, 1272 (10th Cir.) (citing *Goss v. Nelson*, 439 F.3d 621, 635-36) (10th Cir. 2006)), *cert. denied*, 549 U.S. 1039 (2006).

The OCCA found the term "mental harm" not be unconstitutionally vague, when read in the context of the entire statute. This court finds that, when considered in the context of the rest of the statute, the OCCA's analysis of the term neither contravened nor unreasonably applied federal law. *See American Communications Assn. v. Douds*, 339 U.S. 382, 412 (1950) (holding that the standard to be applied in determining whether a statute is unconstitutionally vague "is not one of wholly consistent academic definition of abstract terms," but rather "the practical criterion of fair notice to those to whom the statute is directed," and the particular context is all important). Ground I of petitioner's habeas corpus petition is meritless.

**Ground II: Sufficiency of the Evidence**

Petitioner next alleges the evidence was insufficient to convict him of Witness Intimidation. The OCCA considered and rejected this claim in the direct appeal:

> [C]onsidering the evidence as a whole, a rational trier of fact could have found, beyond a reasonable doubt, that [petitioner's] conduct was intended to influence the complaining witness's testimony before an upcoming session of the multi-county grand jury. The evidence was sufficient to support the

conviction. Okla. Stat. tit. 21, § 455(A); *Jackson v. Virginia*, 443 U.S. 307 (1979); *Spuehler v. State*, 709 P.2d 202, 203-04 (1985).

*Sutton*, No. F-2004-1234, slip op. at 2.

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F.2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court has repeatedly emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

To determine whether there was sufficient evidence presented at trial to sustain

5

petitioner's conviction, the court first must look to Oklahoma law for the elements required for the crime. *Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003). The elements of the crime of Witness Intimidation are:

> First, willfully,
> Second, causing,
> Third, mental harm,
> Fourth, through fear,
> Fifth, to a person,
> Sixth, with the intent to prevent that person from appearing in court to testify, or
> > with the intent to make the person alter his testimony, or
> > because of the testimony given by the person in any civil or criminal trial or proceeding, or
> > to prevent or because of the report of abuse or neglect.
>
> OUJI 2D 3-39

(O.R. 73).

The jury instructions set forth the allegations against petitioner:

> Mr. Sutton is charged in Count 1 of the Latimer County Indictment with Witness Intimidation. In said charge it is alleged that on October 14, 2003, Mr. Sutton was the duly-appointed Director of the Poteau Campus of the Kiamichi Technical Center. It is also alleged that on that date Mr. Sutton did willfully, unlawfully, and feloniously cause mental harm through fear to a person named Stacy Victor Nickell. It is also alleged that Mr. Nickell was at that time a custodian employed at the Poteau Campus of the Kiamichi Technical Center and was a witness to a crime then under official investigation by the Multicounty Grand Jury. It is also alleged that on that date, Mr. Sutton in an open session of the Board of Education of the Kiamichi Technical Center, stated to the Board of Education that Mr. Nickell had just come under investigation by Mr. Sutton for possibly committing the crimes of Embezzlement of Public Property and Making a False Claim for Workers Compensation. It is also alleged that the Defendant's actions were undertaken with the intent to prevent the witness from appearing in court to testify or to make said witness alter his testimony. It is further alleged that all of said acts were committed in Latimer County, Oklahoma.

6

(Jury Instruction 3 at 2; O.R. 71).

The trial transcript shows that Rob Wallace, District Attorney for Latimer and LeFlore Counties, testified that in the late spring or early summer of 2002, anonymous letters concerning misuse of a pickup truck at the Kiamichi Technical Center (KTC) were sent to the Attorney General's office, various law enforcement individuals in the community, and a number of press outlets. (Tr. I 86-88). Wallace received a copy of the letter from an OSBI agent. (Tr. I 87). The Attorney General referred the matter to the state auditor's office, and an investigation of the allegations began. (Tr. I 87). After the press ran a story about the letter, Wallace began receiving phone calls and letters concerning KTC, including an envelope containing photographs allegedly showing the misuse of a KTC vehicle. (Tr. I 88-89). The pickup in the photograph contained a bale of hay, a barbeque grill, and a watering tub holding a campaign sign reading "Mass for Congress." (Tr. I 96-97).

The written allegations contained materials concerning the misuse of the photographed vehicle on numerous occasions, including questions about the travel claims and travel records of the driver Chad Hull, a Vo-Tech employee. (Tr. I 89-90). The pickup allegedly had been used throughout the congressional district to haul materials for the Mike Mass political campaign. (Tr. I 98). Wallace began discussing the allegations with the Attorney General's office, and after the audit report was completed in early 2003, he asked the Attorney General in a February 28, 2003, letter if the multi-county grand jury could be used to conduct a more thorough investigation. (Tr. I 92-94).

In July 2003 the Oklahoma State Bureau of Investigation was assigned to interview the individuals who had provided the information to law enforcement to determine whether they were being intimidated. (Tr. I 101). The multi-county grand jury was empaneled in

October 2003 and began hearing evidence in November 2003. (Tr. I 99).

Stacy Nickell, the victim in this case, testified he was a custodian/maintenance person for KTC in Poteau. (Tr. II 186). Chad Hull was the KTC public relations officer when petitioner became the director of KTC in 2003. (Tr. II 187-89). On August 26, 2002, Nickell observed Chad Hull hauling a Mike Mass campaign sign, a barbeque grill, a bale of hay, a water trough, and a children's pool in the KTC school vehicle. (Tr. II 190, 199). Nickell previously had seen the trough at the school, when Hull was passing out bottled water for Mike Mass. (Tr. II 197-98). Hull was driving in the direction away from Hull's home, and Nickell thought Hull's use of the vehicle was improper. (Tr. II 190-91). After Nickell photographed the contents in the back of the truck, Hull motioned for Nickell to pull over. (Tr. II 192). Nickell and Hull chatted briefly, and Hull gave Nickell some loaves of bread. (Tr. II 192-93). Nickell then left, went to the school to tell his director Joe Smith what had happened, went to Wal-Mart to have the film developed, and then gave the photographs to Smith. (Tr. II 188, 195-96). Mr. Smith initialed and dated the backs of the pictures. (Tr. II 195-96). Nickell gave the photos to Smith, because Hull had made statements that "he was going to get Joe Smith's job and get rid of him," and Nickell was trying to protect Smith. (Tr. II 196). In addition, Nickell was obligated by KTC policy to report any illegal activity to his immediate director. (Tr. II 197).

Joe Smith subsequently was transferred to the Stigler campus, and petitioner became the director at Poteau. (Tr. II 200). Nickell was delivering a package at the school in July or August 2003, when petitioner called him on the radio and said he wanted to visit with him for a minute. (Tr. II 200, 365). They met outside, and after some small talk, petitioner said, "Something about this picture keeps coming up. I don't know what it is about this picture."

8

(Tr. II 200). Nickell testified that petitioner's statements frightened him, because he knew that petitioner and Chad Hull were friends, and they must have figured out that Nickell had taken the picture. (Tr. 201). He did not, however, know how petitioner and Hull had learned of the picture. (Tr. II 201). About a week to ten days later, Nickell had another encounter with petitioner on the campus, and petitioner made essentially the same comments about the picture. (Tr. II 202).

On September 3, 2003, petitioner had one of the other custodians radio Nickell to see petitioner, and petitioner questioned Nickell for about 35 minutes about the photograph. (Tr. II 202-03). Petitioner asked Nickell whether he had taken the picture and repeatedly questioned him, "Where did you take it? Where did you take it? Where did you take it?" When Nickell admitted he had taken the picture, petitioner wanted to know why and when it was shot. (Tr. II 203-04). Petitioner said that Chad Hull was on annual leave on the day in question. (Tr. II 204). Hull was moving, and he threw the items in the truck at the last minute to haul them away. (Tr. II 204). Petitioner claimed to be investigating Hull's explanation for his use of the truck. (Tr. II 204). Nickell testified the conversation made him fear he would lose his job, but petitioner told him he was doing a great job, and his job was not in jeopardy. (Tr. II 205-07). Nickell did not believe petitioner, however, because petitioner had been harassing and grilling him. (Tr. II 207).

The next day on September 4, 2003, petitioner again called Nickell into his office, this time for about an hour and 15 minutes. (Tr. II 207). Petitioner asked him over and over why and when he had taken the picture. (Tr. II 207). Petitioner again stated that Hull had explained he was moving and was on annual leave that day. (Tr. II 207). Petitioner then stated, "This board member here might be right, but we got six more over here," as he

pounded the table. (Tr. II 208). Petitioner also said that as in the election for the President of the United States, "The majority always wins, and I'm on this side. All I'm trying to do is bring you back to Kiamichi." (Tr. II 208). Petitioner named off numerous state congressmen who he claimed were "all on our side." (Tr. II 208). Petitioner again concluded by telling Nickell that Nickell was doing a good job, and his job was not at risk. (Tr. II 209). Nickell testified that he was so frightened by the meeting that he was shaking and he had difficulty sleeping. (Tr. II 208).

The next morning on September 5, 2003, when Nickell went to the front door of his home at about 5:15 a.m. and looked outside, he noticed something was wrong with the windshield of his truck. (Tr. II 210). An OU sign in Nickell's front yard made of rebar had been thrown through the windshield. (Tr. II 200). The truck had been sprayed with spray paint and paint stripper, covering every light, marker, and tag on the vehicle, and writing "terrible stuff" all over it. (Tr. II 200). The same thing was done to his Jeep, both his riding lawnmowers, his golf cart, his house, and his ten-speed. (Tr. II 200). The gas can had been removed from the back of his truck, and the contents were poured all over the Jeep, which was parked very close to his propane tank, making it a potentially explosive situation. (Tr. II 200). The Poteau Police Department investigated, but the crime never was solved. (Tr. I 121-22, 128; Tr. II 218).

At approximately 1:15 or 1:30 p.m., petitioner and Chad Hull drove by Mr. Nickell's home. Nickell stepped outside, and petitioner and Hull made a U-turn and returned. They pulled into the front yard, petitioner got our of his vehicle, straightened his tie, and said, "Man, what the hell happened here?" (Tr. II 220). Nickell said he did not know, and petitioner asked, "Did you piss off some wife's husband?" (Tr. II 220). Nickell said, "No."

(Tr. II 220). Petitioner then said, "Well, I certainly hope you don't think this had anything to do with our conversation yesterday." (Tr. II 220). Nickell replied, "Well, I certainly hope not." (Tr. 220). Petitioner then told Nickell to take as much time as he needed and that he did not care if Nickell called in sick. (Tr. II 221). Chad Hull had gotten out of the vehicle but did not speak to Nickell, although Hull appeared to write down the tag number of Nickell's friend's car that was parked outside Nickell's house. (Tr. II 221). Petitioner and Hull then left. (Tr. II 222). The incident made Mr. Nickell feel "scared to death," and he began keeping a loaded gun under his pillow and a loaded shotgun at the head of his bed. (Tr. II 222-24). He did not have his young son visit for about three months, because he was afraid of what could happen. (Tr. II 225). On petitioner's advice, Nickell took sick leave until the next week. (Tr. II 225).

On September 25, 2003, petitioner called Nickell into his office again. (Tr. II 227-28). Nickell had begun carrying a tape recorder, because he feared for his job and wanted to document his conversations, so he recorded their conversation. (Tr. II 229-30).

On October 2, 2003, Mr. Nickell was served with a subpoena to testify before the multi-county grand jury. (Tr. II 264-66). Nickell was called to another meeting on that same date, and he recorded that meeting as well. (Tr. II 266). Petitioner asked Nickell to sell him the rights to the photograph at issue. (Tr. II 270). Nickell said he needed to seek the advice of his attorney, and petitioner wanted the name of Nickell's lawyer. (Tr. II 271). Nickell admitted in his testimony that he did not actually have an attorney, but he was trying to avoid petitioner's going any further. (Tr. II 274). Petitioner told Nickell they both were "in it deep," and "it was going to get worse before it gets better." (Tr. II 271). Petitioner then named a number of important people and asked Nickell which side he was on. (Tr. II 271).

11

Petitioner told Nickell that petitioner's personal attorney had advised him to buy the rights to the picture, and petitioner offered Nickell $100.00. (Tr. II 272-73). Petitioner also told Nickell he had "messed up" by taking the picture. (Tr. II 273). Nickell testified that petitioner's questioning scared him to death. (Tr. II 274).

On October 12, 2003, *The Oklahoman* published an article stating Mr. Nickell had been subpoenaed to testify before the grand jury about intimidation and other misconduct surrounding KTC. (Tr. II 313-15; Defendant's Ex. 1). The newspaper also published the photo of Chad Hull using the KTC pickup to haul a campaign sign for Mike Mass, and it reported the vandalism of Nickell's home and vehicles. (Tr. II 313, Defendant's Ex. 1). In addition, the article reported that petitioner had offered to buy the photograph from Nickell for $100.00. (Defendant's Ex. 1).

On October 14, 2003, petitioner called a staff and faculty meeting at the school in which he stated the teachers, custodians, and support staff were second to none. (Tr. II 278). He also said, "Up until this point I've not had any trouble with any of my custodians." (Tr. II 278). Petitioner then pointed out Mr. Nickell and said, "Mr. Nickell, have I ever threatened you or have I ever intimidated you?" (Tr. II 278-79). Nickell testified that he just sat there in a state of shock, and said, "N-n-no," because he was afraid to answer the question. (Tr. II 279). Petitioner replied, "There. I have it in front of all these witnesses. I've never threatened or intimidated Mr. Nickell." (Tr. II 279). The meeting then ended. (Tr. II 279). Nickell testified that he again felt scared to death. (Tr. II 279).

On that same date petitioner announced at a KTC board meeting that he was conducting an investigation of Nickell, and petitioner accused Nickell of wrongfully taking KTC property while receiving worker's compensation. (Tr. II 280). The pertinent portions

of petitioner's statements at the board meeting were as follows:

> [A]bout a year ago, a picture surfaced of Mr. Hull, supposedly Mr. Hull. And you're going to see in the picture that that's the school truck assigned to him, and with an assortment of junk in the back and a Mike Mass sign upside down in it. If any of you haven't seen it, we can show it to you, but I feel like by now, you've probably all seen it. I saw it, and it was very disturbing to me. It bothered me, and I didn't like it because I'm telling you, I love Career Tech and I love Kiamichi. I don't want to see our employees campaigning in school vehicles. It's wrong. No, I don't like it.
>
> And so I--I thought I was probably gonna have a bone to pick with Mr. Hull. And so the next time he made the Atoka campus, I asked him. "Say, Mr. Hull, how could you do that?" . . . And I asked Mr. Hull, and he said--he told me, "I was on annual leave that day, I was just moving and I had--had moved everything. . . . The school vehicle--the school vehicle was the last thing there. And he said, "I looked out, and I had a few items left, and I put them in the back of the school pick-up." I said, "Boy I wish you hadn't done that. That's terrible. Just don't do it." . . . He also told me,"I can tell you where the picture was taken and who took it." He said the custodian that works at the Poteau campus by the name of Stacy Nichols [sic] took that picture. He said, "I lived up on the hill and had to drive by his house several times while I was moving." He said, "I feel confident that --that he saw me moving and was just waiting for me to use the school vehicle to move furniture."
>
> . . . So on Tuesday, I just asked Stacy Nichols [sic] because I was curious. I was going to check our Mr. Hull's story. . . . And I asked him, I said, "Hey, did you take that picture of Chad Hull?" We were alone in the office, and he said, "Yes, I did." As a matter of fact, I won't share the quote with you, but actually it was something similar to the fact that you're the first one that's had the "blank" (inaudible) to ask me that question." I said, "Well, if I want to know something, that's the only way I know to do, is to ask." He said he did take the picture. Then I asked him--I said "was he in it?" "Was he on his way to a political event?" "I don't know." "Was he coming from work?' "I don't know." "Where was it taken?" "Behind the Tote-a-Poke on Witteville Drive."
>
> Well, when I went and found out where Mr. Hull lived up on the hill, and I saw that he had indeed in [sic] a house and did indeed drive by, it began to give some credibility to his story. So, therefore, it bothers me greatly that for the last year, I've heard this picture was of a gentleman campaigning in a

13

school pick-up. It was a picture of a gentleman who used bad judgment moving some personal property in a school pick-up and that's two entirely separate issues, and that bothers me. So--but I pretty much said, "Okay, let the grand jury investigate it and I think if they investigate it as thoroughly as I did, they'll come to the same conclusion I did."

I had pretty much forgot [sic] about it, and then a picture surfaced a few weeks ago. And I don't know who gave it to the newspaper, and I don't blame the newspaper for printing it. The Latimer County News Tribune is probably here today, too. John, we're glad you're here to hear his version. The title said, "Voter Education--KTC. Inside sources said Tuesday that the above photo of a Kiamichi Technology Center District pick-up being used to transport political campaign items is among the evidence presented to a grand jury." . . .

So the next time the custodian came in a couple of weeks ago, I said, "Hey, did you know your picture was published again in a local newspaper?" He said, "Yes." I said, "How did you know?" He said, "Somebody called me." I said, "Who called you?" He said, "I don't remember." I said, "Well, don't tell me you don't remember. If you don't want to tell me, just tell me you don't want to tell me because it's none of my business. I mean, you took the picture. But--but I said, "You know, your picture--you took this over here of a gentleman that was moving, I believe. And I said, "But it's made to look like it's over here. They even used the same expression on it." I said, "You know, I'd buy the rights to your picture, and I wouldn't let them do this that way." And I said--he said, "Well, I've been advised not to talk to you anymore about the picture." I said, "Who advised you?" He said, "Counsel." I said, "Well, who's your counsel? I'll have my attorney talk to your attorney." He wouldn't tell me. I said, "Well, that's okay." I said, "No hard feelings." But I said, "You need to think about that, because, obviously, the grand jury is going to want to investigate, and we're going to let the truth out." I said, "All I'm going to tell you is I encourage you to tell the truth. Just tell the truth. Where that picture was taken, how it is being used. Don't let it be misused like that." So, at the end of [the] conversation, he said, "Well, how much were you going to give me for it?" And so I jokingly said, "Well, it's my own money. I mean, no one has put me up to this. I was thinking maybe you might make 20 bucks, but how about $100?" At that point, he said, "Well, that wouldn't pay for the damage to my windshield." And then I said, "Well, you know, I'm sorry about what's happened there, but at least the circumstances are not related." And they're not. Anybody that knows me certainly knows

14

> that. And that was the end of our discussion.
>
> A couple of days later, I did get some calls from a gentleman here today from The Daily Oklahoman. And I--he printed just what I said, because if you tell the truth, you don't have to remember, and I think what I told him was pretty much what I told Nichols [sic] in our conversation. But I'm--I'm concerned. Now, in the last couple of days, that's one investigation--but I've been conducting some other investigations that really concern me. I just had some pictures surface of the same custodian, Mr. Nichols [sic], and these were taken before I became director, and these pictures have--were the same (inaudible) this investigation is not concluded. When it's concluded, then you may want to make it an action item on your agenda, Mr. President. For right now, I have some pictures of that same custodian, Stacy Nichols [sic], using our school truck to place concrete pillars at a place called Nichol Lake up on a hill in Poteau. Allegations from witnesses tell me he was on worker's comp at the time. I have not confirmed that yet. I will be investigating that, because he is an employee at the Poteau campus. If he was indeed using our school pick-up to move personal property to a private location and was not on the clock at the time, then I will be consulting with my supervisors, Mr. Coleman, Representative Small, the District Superintendent, my superintendent, Mr. Jim Beard, as well as (inaudible) attorney, so I can bring this information to the board and shed more light on it for you. Right now, it's just an investigation, and that's what I have. . . .
>
> I will pass around one of the pictures showing the employee, so you can see that in that investigation I was referring to. That is the school pick-up. That location is a place called Nichols Lake. Poteau people may be familiar with it. After reading the events in the paper, a citizen came forward and brought that picture to me and said, "I knew I should have said something before, but I did not want to get so involved at that time." . . . I have other pictures, too. . . .

(State's Exhibit 376 at 27-31).

Nickell learned about petitioner's statements at the board meeting from someone who was present at the meeting. (Tr. II 280). Nickell did not know petitioner would accuse him of criminal conduct at the board meeting, and he was not given an opportunity to explain the

15

allegations before they were presented to the board. (Tr. II 281). He was very afraid he would lose his job. (Tr. II 281). After Nickell got off work that afternoon, he was driving home on his motorcycle, when petitioner come down a hill at a high rate of speed and got into Nickell's lane of traffic. (Tr. II 282-83). Petitioner called Mr. Nickell to a meeting on October 15, 2003, where petitioner threw down pictures of Nickell and said, "I guess you know what these are." (Tr. II 284-85). Warner Baxter and Jim Beard also were present. (Tr. II 284, 301). Nickell said he did not know. (Tr. II 285). The photographs showed the truck and the concrete pillars petitioner referenced at the board meeting. (Tr. II 286). Nickell recognized himself in the photos and said he thought they might have been from the summer of 2000 or 2001. (Tr. II 286-87). He denied they had been taken in 2003. (Tr. II 286). Nickell explained that he had been instructed by Mr. Smith, his former director, to get rid of the concrete pillars. (Tr. II 287). Nickell thought he could use some of them at his home, so he took some home and set them out. (Tr. II 287). The remaining pillars were dumped in the back of the school campus with the piles of dirt, junk, and pieces of concrete from renovations. (Tr. II 287-88).

Petitioner told Nickell he was being accused of hauling the concrete pillars while he was off work on worker's compensation, which Nickell denied. (Tr. II 289-90). Nickell told petitioner to check his records, which would show when he was off work for his back surgery, but petitioner was not satisfied with Nickell's explanation. (Tr. II 290). Petitioner said there was a little more work to do on the matter, which Nickell took as meaning petitioner would not stop intimidating him. (Tr. II 303-04). Petitioner also recorded this conversation, and later in the day he photographed the junk pile where he dumped the concrete bumpers to show it contained chunks of concrete and junk. (Tr. II 293, 310).

<mark>16</mark>

No evidence was presented showing petitioner's allegations against Mr. Nickell were true. Nickell's worker's compensation form, dated November 6, 1998, indicated he could return to work on November 17, 1998, and the Return to Work form from Sparks Medical Foundation indicated he could go back to work on February 28, 2000. (Tr. 306-07; State's Ex. 31). Mr. Nickell did return to work. (Tr. 307). Former KTC Director Joe Smith also testified that Nickell's removal of the discarded concrete bumpers for disposal on private property did not violate policy, and the removal did not occur while Nickell was receiving workers' compensation. (Tr. III 376-81).

After a careful review of the record, the court finds the evidence was sufficient under the standard of *Jackson v. Virginia*. The fact that the victim was not present at the board meeting did not mean that petitioner's statements did not cause him to suffer intimidation when he learned of the statements. Therefore, the OCCA's determination of this issue was not contrary to, or an unreasonable application of, clearly established federal law. The court further finds the OCCA's decision was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *See* 28 U.S.C. § 2254(d). Ground II of this petition also fails.

**Ground III: Jury Instructions**

Petitioner next alleges the trial court erroneously instructed the jury on the elements of the offense, allowing the jury to convict petitioner on an alternative element that was not germane to the change. The jury instructions at issue are set forth under Ground II of this Order. The OCCA found no merit in the claim as follows:

> [T]he trial court's inclusion of all four alternative specific-intent elements from OUJI-CR (2d) No. 3-39 was error, as two of these alternatives were not germane to the evidence or the State's theory. Nevertheless, we fail

> to see any reasonable possibility of jury confusion or conviction under a theory not alleged and proven. *Coulter v. State*, 734 P.2d 295, 299-300 (Okla. Crim. App. 1987); *Maghe v. State*, 620 P.2d 433, 436 (Okla. Crim. App. 1980); *Oglesby v. State*, 520 P.2d 684, 686 (Okla. Crim. App. 1974). The title of the relevant Uniform Jury Instruction, "Witness Intimidation," was not prejudicially confusing despite the fact that the word "intimidation" is not used in the statute; the jury was properly instructed as to the elements which constitute the crime, and it is these elements, not the title, which define the offense. *State v. Johnson*, 877 P.2d 1136, 1141 (Okla. Crim. App. 1992). We find no plain error in the trial court's failure to instruct the jury on a definition of "mental harm" neither adopted by the legislature nor proposed by either party. *Blunt v. State*, 743 P.2d 145, 147 (Okla. Crim. App. 1987).

*Sutton*, No. F-2004-1234, slip op. at 2-3.

> In a habeas corpus proceeding attacking a state court judgment based on an erroneous jury instruction, a petitioner has a great burden. *Lujan v. Tansy*, 2 F. 3d 1031, 1035 (10th Cir. 1993), *cert. denied*, 510 U.S. 1120 (1994). A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial. *Shafer v. Stratton*, 906 F.2d 506, 508 (10th Cir. 1990), *cert. denied*, 498 U.S. 961 (1990). "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (footnote omitted). The question in this proceeding is not whether the instruction is "undesirable, erroneous, or even 'universally condemned,'" but whether the instruction so infected the trial that the resulting conviction violates due process. *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)). "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.* at 155. The degree of prejudice from the instruction error must be evaluated in the context of the events at the trial. *United States v. Frady*, 456 U.S. 152, 169 (1982).

*Maes v. Thomas*, 46 F. 3d 979, 984 (10th Cir.), *cert. denied*, 514 U.S. 1115 (1995).

After careful review the court finds petitioner suffered no prejudice from the error in his jury instruction. The court agrees with the OCCA that there was no reasonable

probability that the jury was confused. Because the OCCA's determination was consistent with federal law, Ground III is meritless.

**Ground IV. Prosecutorial Misconduct**

Finally, petitioner alleges the prosecutor erroneously told the jury that petitioner was charged with this crime because the grand jury had proof beyond a reasonable doubt. The OCCA considered and denied the claim on direct appeal:

> [T]he prosecutor's comment in *voir dire* that "beyond a reasonable doubt" did not mean "beyond any doubt" was not plain error in the absence of an objection. *Van White v. State*, 990 P.2d 253, 271 (Okla. Crim. App. 1999). The prosecutor's inquiry into any possible biases among the prospective jurors, because the Attorney General's Office was prosecuting the case from a grand jury indictment, was proper. *Dodd v. State*, 100 P.3d 1017, 1029 (Okla. Crim. App. 2004). The prosecutor's rhetorical question to prospective jurors, suggesting that charges are not filed absent proof of guilt beyond a reasonable doubt, was improper, but was cured by the court's contemporaneous admonition, as well as by formal instructions at other times during the trial. *Williams v. State*, 22 P.3d 702, 711 (Okla. Crim. App. 2001). Further, because the jury acquitted [petitioner] on all but one charge, we fail to detect any prejudice. *Harjo v State*, 882 P.2d 1067, 1076 (Okla. Crim. App. 1994).

*Sutton*, No. F-2004-1234, slip op. at 3.

> In determining whether a petitioner is entitled to federal habeas corpus relief for prosecutorial misconduct, it must be determined whether there was a violation of the criminal defendant's federal constitutional rights which so infected the trial with unfairness as to make the resulting conviction a denial of due process. A showing which might call for application of supervisory powers is not sufficient "for not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'"

*Fero v. Kerby*, 39 F.3d 1462, 1473 (10th Cir. 1994), *cert. denied*, 515 U.S. 1122 (1995) (citations omitted).

Here, the court finds petitioner has failed to set forth any federal claim concerning the

19

prosecutor's statements, and the OCCA correctly found there was no prejudice arising from the statements. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (citing 28 U.S.C. § 2241; *Rose v. Hodges*, 423 U.S. 19, 21 (1995) (per curium)). "Habeas corpus is a civil proceeding and the burden is upon the petitioner to show by a preponderance of the evidence that he is entitled to relief." *Beeler v. Crouse*, 332 F.2d 783, 783 (10th Cir. 1964) (citing *Teague v. Looney*, 268 F.2d 506 (10th Cir. 1959)). Here, the court finds petitioner has failed to present an argument supporting federal habeas relief.

**ACCORDINGLY**, the Magistrate Judge recommends that this action be, in all respects, dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given fourteen (14) days from being served with a copy of this Report and Recommendation to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

**DATED** this 23rd day of November 2010.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE

20